## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| RICHARD GORMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11 CV 2085 RWS / DDN |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Richard Gorman for supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the final decision of the Administrative Law Judge (ALJ) be affirmed.

## I. BACKGROUND

Plaintiff Richard Gorman, who was born on February 21, 1970, applied for Title XVI SSI benefits on January 5, 2010. (Tr. 123-126.) He alleged an onset date of disability of May 5, 1992, citing bipolar disorder, anxiety and post-traumatic stress disorder (PTSD). (Tr. 150.) Plaintiff's applications were denied initially on February 16, 2010, and he requested a hearing before an ALJ. (Tr. 69, 76.)

On December 13, 2010, following a hearing, the ALJ found plaintiff was not disabled. (Tr. 12-18.) On October 4, 2011, the Appeals Council denied plaintiff's request for review. Thus, the decision of the ALJ stands as the final decision of the Commissioner. (Tr. 1-3.)

## II. MEDICAL HISTORY

On December 11, 2009, plaintiff went to the emergency room of the Metropolitan St. Louis Psychiatric Center and stated he was feeling overwhelmed to a physician, and the feeling of being overwhelmed prevented him from functioning in school, completing military basic training or holding a job. He reported receiving minimal psychiatric care outside of some counseling in college. He further stated he suffered from ever-present anxiety and suffered from nightmares caused by his bipolar mother during childhood. He appeared calm, cooperative, and well-groomed, though his psychomotor skills appeared agitated, even "very wild at times." (Tr. 213.) D. Hayreh, M.D., the attending physician, assigned a GAF score of 41-50,[1] and suggested the highest GAF in the past year was 51-60[2]. Dr. Hayreh further stated plaintiff would likely benefit from outpatient treatment to manage his anxiety, and from assistance with finding and managing work; he prescribed Citalopram[3]. (Tr. 211, 213, 215.)

On January 26, 2010, plaintiff returned to the Metropolitan St. Louis Psychiatric Center emergency room and was voluntarily admitted. According to the psychology department, plaintiff did not meet the criteria for PTSD. Peter Fahnestock, M.D., noted plaintiff had discontinued his medication because it caused "palpitations" and anorgasmia.[4] Dr. Fahnestock noted plaintiff had

---

[1] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. A score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000) ("DSM-IV-TR").

[2] A GAF score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). DSM-IV-TR, at 32–34.

[3] Citalopram is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on September 26, 2012).

[4] Anorgasmia is the failure to experience an orgasm; it may be biogenic, secondary to a physical disorder or medication or drug abuse, or psychogenic, secondary to psychological or
(continued...)

been experiencing symptoms consistent with a major depressive episode, including persistently low mood, somewhat increased sleep, low energy, tearfulness, feelings of hopelessness, and passive death wishes. Upon admission, plaintiff appeared disheveled and unshaven with fair hygiene. Plaintiff appeared well nourished and his psychomotor activity was unremarkable. Although plaintiff spoke with a restricted tone, his eye contact was good, and he acted appropriately and cooperatively during the interview. There was no suicidal or homicidal ideation, and there were no auditory or visual hallucinations or delusions. His flow of thought was logical, sequential, and goal-directed. He was alert and oriented, and his long-term memory was fair. His level of intelligence was average to above average considering his vocabulary, fund of knowledge, and level of educational attainment. Plaintiff's family psychiatric history states:

> [his] mother reportedly had bipolar disorder with multiple hospitalizations for mania and suicide attempts. Per the description of the patient and family, the diagnosis sounds genuine. The patient's father developed psychosis late in life, which may have been related to dementia. Mr. Gorman is one of seven siblings. One other sibling receives SSI Disability for some form of psychotic illness.

(Tr. 227.) Plaintiff was discharged on January 29, 2010, with a diagnosis of generalized anxiety disorder, major depressive disorder, and dependent personality disorder. (Tr. 222-24.)

Dr. Fahnestock recommended plaintiff receive Paxil,[5] which was started on the day of admission. The dosage was adjusted to help plaintiff sleep, and Clonazepam[6] was added. The psychology department determined plaintiff possessed Cluster C personality traits,[7] and between Dr.

---

[4](...continued)
situational factors, or have a multifactorial cause. Stedman's Medical Dictionary 98 (28th ed. 2006).

[5]Paxil is used to treat depression, panic attacks, obsessive-compulsive disorder (OCD), anxiety disorders, and post-traumatic stress disorder. WebMD, http://www.webmd.com/drugs (last visited on September 26, 2012).

[6]Clonazepam is used to prevent and control seizures and to treat panic attacks. WebMD, http://www.webmd.com.drugs (last visited on September 26, 2012).

[7]Cluster C Personality Traits are considered avoidant, dependent, and obsessive compulsive.
(continued...)

Fahnestock's and the psychologist's observations, plaintiff met the criteria for dependent personality disorder. Plaintiff's condition on discharge was stable and improved, and his GAF score was 60. During the examination, plaintiff provided the following information:

> He was in the Navy briefly in 1990 and reports an honorable discharge for medical reasons after he was hospitalized. He experienced significant anxiety during his youth, missing 30 plus days of school per year and eventually dropping out of school and earning a GED. Later, he would attend St. Louis University where, interestingly, he was the member of a fraternity, though he continued to experience anxiety related to course work and dropped out several times before eventually graduating in 1996. He then briefly attended law school, but dropped out after roughly one week. His employment history has been very limited since then . . . .

(Tr. 227.) He was scheduled for a psychiatric followup at Hopewell Center on February 12, 2010. (Tr. 224-28.)

On February 12, 2010, Robert Cottone, M.D., filled out a Psychiatric Review Technique form. Dr. Cottone indicated that plaintiff suffered from major depressive disorder, which was recurrent and moderate, generalized anxiety disorder, and dependent personality disorder. In addition, Dr. Cottone noted that plaintiff had no restriction in activities of daily living; marked difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and suffered repeated episodes of decompensation, each of extended duration. (Tr. 249, 252-54, 257.)

Further, a mental residual functional capacity assessment was conducted during which Dr. Cottone made the following determinations: plaintiff must avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, close proximity to co-workers, or public contact. Dr. Cottone also noted that plaintiff could understand, remember, carry out and persist at simple tasks, make simple work-related judgments, relate adequately to co-workers or supervisors, and adjust adequately to ordinary changes in work routine or setting. (Tr. 263.)

On March 23, 2010, a Psychosocial / Clinical Assessment of plaintiff was conducted by Thelma Coleman, MSW, QMHP. Plaintiff stated his eating and his sleeping habits were "good." Plaintiff further reported his compliance with his medication was "good." Plaintiff stated his

---

[7](...continued)
DSM-IV-TR, at 685, 686.

previous hospitalizations were helpful and his current medication regimen was effective. Plaintiff reported that he felt guilty and down because he did not have money to help with bills, and he was appealing the denial of his social security benefits application and expressed interest in obtaining Medicaid. (Tr. 271, 273.)

Ms. Coleman stated plaintiff had no functional deficits regarding his safety and personal care, as he seemed knowledgeable about community safety issues as well as generally aware of his safety. Further, plaintiff denied any physical limitations and reported independent travel within the community was not a problem. Ms. Coleman further stated plaintiff said he had a sister who had been hospitalized for mental illness. The Household Management section of the assessment showed plaintiff said he cleaned and took out trash, but noted functional deficits due to lack of income and chronic mental illness. He stated he had a management position at Walgreens in Phoenix, Arizona, but had to quit because of his mental illness. He further stated he was "motivated to improve his lot in life," but believed his mental illness caused him to have a lack of income. He also said he confided mostly in his sister, Eileen, and he had few friends. The assessment diagnosed him with generalized anxiety disorder, major depressive disorder, which was recurrent and moderate, and ruled out PTSD. Further, the assessment stated plaintiff had Cluster C traits, a history of childhood concussion, and a GAF of 40. (Tr. 273-76.)

On October 15, 2010, Dr. Larici at the Hopewell center directed plaintiff to "get a job." An undated note restates Dr. Larici's treatment plan for plaintiff: vocational rehabilitation, to get a job, and to go back to school. Plaintiff stated he had the desire to work and stay busy, and he was working through vocational rehabilitation towards employment goals. He stated that the Independence Center could help him by possibly giving him employment. He further stated an obstruction to those goals were anxiety and a fear of relapse. Another undated psychiatry progress note indicated he told the physician, "my attorney want[s] record[s] from this place so I can get disability." (Tr. 270, 279-80, 287.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on November 16, 2010, where plaintiff testified to the following. (Tr. 22-64.) He takes Paxil for his depressive disorder, which makes him edgy and

a little nervous. He also takes Clonazepam to control his anxiety, though a side effect is drowsiness. (Tr. 40.)

Plaintiff has been at his transitional job at TALX for a full month. Plaintiff started working at TALX on October 19, 2010. At TALX, plaintiff enters data relating to unemployment claims into the computer. He earns ten dollars per hour to enter the proper dates, Social Security numbers, and separation codes, which explain why the person is no longer employed. Plaintiff stated he falls asleep for short periods of time while at work, then wakes up because he is terrified someone might see him. He constantly struggles against drowsiness, which sets in after about an hour to an hour and a half of sitting in front of the computer; this happens on a daily basis. Although the effects are short-lived, he walks around briefly or gets coffee to wake himself up. Plaintiff feels he is able to complete the tasks assigned to him, despite the fact that there is not always work to do. He further stated he was afraid of whether he did the job accurately because he receives no feedback from the company. Plaintiff received job training from Tom, his placement manager. Tom sat with plaintiff during his first week to train plaintiff how to properly enter data. Plaintiff testified he feels scared and anxious after he finishes his shift at TALX. He also stated the bus he uses to get home after work can get rowdy, and it makes him nervous. (Tr. 38, 40-42, 45-47, 56.)

Plaintiff stated he briefly served in the Navy from approximately November 1990 through January 1991. Plaintiff did not complete basic training, because he was hospitalized in the psychiatric hospital and honorably discharged for medical reasons. Consequently, plaintiff received no vocational training in the Navy. (Tr. 47-48.)

Plaintiff has completed college, receiving a bachelor of arts in psychology, though it took him eight years to finish his degree. He started at Meramec in 1988, transferred to the University of Missouri-St. Louis, and graduated from St. Louis University (SLU) in 1996. In 1995, plaintiff enrolled in law school at the University of San Diego, though he quit after one week because he was having anxiety issues and he did not believe he would be able to handle the course load. Then, in 1997 or 1998, he took MBA courses at SLU before being removed from the program. He was unsure whether he received any credit from the MBA program because he could not remember whether he completed any courses or not. He did not believe he was enrolled full-time in the MBA program; he believed he was only in night classes. Plaintiff was given a warning after the first

semester for failure to make progress, and because he did not make sufficient progress, SLU would not allow him to continue. He enrolled in Webster University's MBA program not long after SLU, and he had the same outcome. (Tr. 48-50.)

Plaintiff testified that he worked as a computer consultant in the late '90s for Edward J. McCarthy, his brother's accountant, for three months. Plaintiff did not have any technical expertise, and Mr. McCarthy was not able to pay for formal training. Mr. McCarthy instructed plaintiff to acquire Microsoft Certified Systems Engineer (MCSE) training, which plaintiff did not do. Plaintiff was paid ten dollars per hour and worked approximately twenty hours per week. He also worked for the Allegis Group after being placed there by a temp agency. At Allegis Group, he helped clients resolve issues with Microsoft Windows XP by going to the physical address and troubleshooting the problem. He held that position for approximately a month and a half and received no specialized training. (Tr. 50-51, 53-54.)

Plaintiff testified that he spends his time off at home, watching television, or walking. He cleans the house and makes cereal or sandwiches to eat. He stated he had been living on his own for about three and a half to four months in a building owned by his brother. He vacuums once a month, and he owns a cat, which he cares for by feeding it and cleaning the litter box. He has a valid and unexpired driver's license, but no car. (Tr. 42-45, 55.)

Ms. Schrader, an employment specialist, also testified at the hearing, stating she has worked with plaintiff during the seven months he started attended the Clubhouse. Ms. Schrader was aware plaintiff had been admitted to the Metropolitan Psychiatric Center. Initially, her team determined plaintiff was interested in transitional work. In her professional judgment, plaintiff needed sheltered or assisted work based on the issues plaintiff exhibited while volunteering. She noticed plaintiff's inability to concentrate on the task at hand, the symptoms of his anxiety and depression, and his resulting inability to come to the center on a regular basis. She further testified since plaintiff started seeing a psychiatrist and taking medications on a regular basis, he seemed stable, though he continued to struggle with anxiety and depression. Ms. Schrader is aware of plaintiff's placement at TALX. She stated plaintiff had thus far been doing well on the job. Ms. Schrader noted plaintiff's indecision had been reduced by thirty percent with the aid of the medication, though he still struggles with anxiety. (Tr. 27-32.)

Vocational Expert John McGowan (VE) testified, answering hypothetical questions by the ALJ. The first was:

> [W]ould you please assume an individual the same age, education, and work experience as the claimant. The individual would be able to perform work at all exertional levels, is able to person simple, routine, and repetitive tasks, but would be allowed superficial and no direct interaction with the public. . . .

(Tr. 60.) Dr. McGowan's responded that such a hypothetical individual could perform work as a small parts assembler, electronics assembler, and plastic products inspector. According to Dr. McGowan, there are 8,600 small parts assembler positions in Missouri and 345,000 positions nationally. There are also 4,500 electronic assembly type positions in Missouri and 90,000 positions available nationally. Additionally, there are 1,730 plastic products inspector positions available in Missouri, and 75,650 positions available nationally. (Tr. 60-61.)

The second hypothetical question was, "[p]lease assume the same restrictions as hypothetical one . . . modified to indicate no interaction with the public and only occasional interaction with co-workers and supervisors . . . ." (Tr. 61.) Dr. McGowan stated that the such a hypothetical individual could also perform the previously mentioned jobs. (Tr. 62.)

The third and final hypothetical question was with "[n]o exertional limitations. In this scenario, work would be isolated from the public with only occasional supervision and only occasional interaction with co-workers, and because of the individual's symptoms and side effects from medications, he or she would be absent from work four days per month." Dr. McGowan responded that such an individual could perform no jobs in Missouri or nationally. Specifically, Dr. McGowan stated, "[after] four days, they'd be gone." (Tr. 60-62.)

### III. DECISION OF THE ALJ

On December 13, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 12-18.) At Step One of the prescribed regulatory decision-making scheme,[8] the ALJ determined plaintiff had not engaged in substantial gainful activity (SGA) since December 18, 2009. At Step Two, the ALJ determined plaintiff had severe impairments of depression, anxiety, and personality

---

[8] See below for explanation.

disorder.  At Step Three, the ALJ found plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  (Tr. 14.)

The ALJ found plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels, but with the following nonexertional limitations: he was limited to jobs that involve no public contact and only occasional interaction with co-workers and supervisors.  The ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the RFC assessment.  (Tr. 15-16.)

Regarding  plaintiff's alleged limitations, the ALJ stated that  plaintiff said he was unable to get any medical care to manage his mental impairments, but a review of his medical treatment records demonstrated plaintiff received inpatient psychiatric treatment in January 2010, and then started receiving outpatient psychiatric treatment in March 2010.  The ALJ found that upon discharge from the hospital his doctor assigned a GAF of 60, which suggests plaintiff's symptoms were mild to moderate, and consistent with a person capable of employment.  Further, the ALJ determined Dr. Larici, plaintiff's own psychiatrist, believes he is capable of doing work because Dr. Larici is encouraging plaintiff  to get  a  job.   The ALJ found plaintiff had demonstrated significant improvement in response to treatment, and his treating psychiatrist appeared confident plaintiff is capable of working.  (Tr. 16-17.)

At Step Four, the ALJ found plaintiff had no past relevant work.  At Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that plaintiff can perform.  The ALJ concluded plaintiff was not disabled.  (Tr. 17-18.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind

would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. § 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual qualifies as disabled. 20 C.F.R. § 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his impairment meets or equals a listed impairment. 20 C.F.R. § 416.920(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 416.920(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. § 416.920(a)(4)(v); Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant had no PRW or cannot return to his PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Pate-Fires, 564 F.3d at 942.

## V. DISCUSSION

Plaintiff argues the ALJ erred because he (1) failed to point to "some" medical evidence, and therefore the RFC determination lacks a substantial evidentiary basis; and (2) because the hypothetical questions to the Vocational Expert (VE) did not capture the concrete consequences of plaintiff's impairment, the VE's responses did not represent substantial evidence.

**A. RFC Determination**

Plaintiff argues the ALJ failed to identify any medical evidence to support the RFC determination. RFC is the most a claimant can perform despite his physical or mental limitations. 20 C.F.R. § 416.945(a). The ALJ has the primary responsibility for assessing a claimant's RFC based on all relevant evidence. Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010). A claimant's RFC is a medical question and "at least some" medical evidence must support the ALJ's RFC determination. Id. A treating physician's opinion concerning an applicant's physical limitations is entitled to substantial weight. Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).

The ALJ expressly based his determination in part on medical evidence. The ALJ summarized plaintiff's medical history including his treatment in January and March of 2010. He stated plaintiff had been discharged with a GAF of 60, which indicated he was capable of employment. The ALJ also recited the testimony of Ms. Schrader, an employment specialist, who stated plaintiff's decision-making capabilities had improved during the month preceding the hearing. The ALJ included a statement from plaintiff's treating psychiatrist, Dr. Larici, who advised plaintiff "to get a job." (Tr. 269.) The ALJ, after hearing all the evidence, determined Dr. Larici's opinion was entitled to more weight than Ms. Schrader's, because Dr. Larici was plaintiff's treating psychiatrist. Because the statement of Dr. Larici is entitled to substantial weight as plaintiff's treating psychiatrist, and because it was not inconsistent with other evidence in the record, the ALJ's decision to give it more weight than Ms. Schrader's opinion was not error.

In addition, the ALJ considered medical information from Dr. Cottone, that plaintiff has serious difficulties in social functioning, which indicate a basis for significant restrictions in social interactions. The ALJ noted Dr. Cottone's evaluation did not take plaintiff's improvement, as observed by Ms. Schrader, into consideration. (Tr. 16-17.)

The ALJ's determination of plaintiff's RFC is supported by substantial evidence in the record which includes medical evidence.

**B. Hypothetical Question**

Second, plaintiff argues the hypothetical question to the VE did not capture the concrete consequences of plaintiff's impairment. Therefore, he argues that the VE's response is not properly considered substantial evidence.

Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hillier v. Social Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007). Hypothetical questions should set forth impairments supported by substantial evidence on the record and accepted as true by the ALJ, and capture the 'concrete consequences of those impairments. Id.

The ALJ's examination of the VE posed three hypothetical questions. The ALJ phrased all the questions around limited interaction with public, coworkers, and supervisors. In the first hypothetical question, the ALJ stated,

> [W]ould you please assume an individual the same age, education, and work experience as the claimant. The individual would be able to perform work at all exertional levels, is able to perform simple, routine, and repetitive tasks, but would be allowed superficial and no direct interaction with the public. . . .

(Tr. 60.)

For the second hypothetical question, the ALJ stated, "[p]lease assume the same restrictions as hypothetical one . . . modified to indicate no interaction with the public and only occasional interaction with co-workers and supervisors . . . ." For the third and final hypothetical question, the ALJ stated, "[n]o exertional limitations. In this scenario, work would be isolated from the public with only occasional supervision and only occasional interaction with co-workers, and because of the individual's symptoms and side effects from medications, he or she would be absent from work four days per month." (Tr. 61-62.)

The hypothetical questions posed by the ALJ included the concrete consequences of plaintiff's impairments. The questions were based on the medical evidence in the record and they set forth the characteristics of plaintiff's impairments that were supported by substantial evidence on the record and which the ALJ found to be true.

## VI.  RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation.  The failure to file timely written objections may waive the right to appeal issues of fact.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on December 3, 2012.